IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



FILED

FEB 05 2018

Clerk, U.S. Courts
District Of Montana
Missoula Division

TAFFORD and LaRAYNE OLTZ,

       Plaintiff,

vs.

SAFECO INSURANCE COMPANY
OF AMERICA,

       Defendant.

CV 16–124–M–DWM

ORDER

This case arises from a dispute over a homeowner's insurance policy. Plaintiffs Tafford and LaRayne Oltz (the "Oltzes") argue that Defendant Safeco Insurance Company of America ("Safeco") wrongfully refused to provide coverage for losses to their home. Safeco rebuts that the Oltzes' losses are not covered because they were caused by excluded perils. Safeco has filed a motion for summary judgment, (Doc. 15), and the matter is ripe for ruling. Safeco's motion is granted because the undisputed material facts, viewed in the light most favorable to the Oltzes, show that Safeco properly denied coverage for the losses to the Oltzes' home.

## BACKGROUND

-1-

The following facts are undisputed, (*see* Fact Statements, Docs. 17, 24), or

viewed in the light most favorable to the Oltzes, *Tolan v. Cotton*, 134 S.Ct. 1861,

1863 (2014) (per curiam).

The Oltzes own a home at 11 Golf Drive, in Whitefish, Montana, and since

January 13, 2013, have purchased their homeowner's coverage from Safeco.

(Compl., Doc. 4 at ¶ 7; Ans., Doc. 2 at ¶ 7.) In the summer of 2015, the Oltzes

noticed instability in the deck posts of their home and that the deck was beginning

to pull away from the house. (Plaintiff's Statement of Disputed Facts, Doc. 24 at

¶ 1.) They were at that time insured under Safeco Homeowners Policy No.

OM02493299 (the "Policy"). (*Id.* at ¶ 4.)

The Oltzes contracted with Teksu Rivera of Native, Way, Inc. to investigate

and repair their deck. (*Id.* at ¶ 2.) Rivera inspected the deck in July and advised

the Oltzes to stop using it. (*Id.*) After discovering that the area where the deck

attached to the home was rotted, Rivera and his employees began removing

portions of the deck for safety reasons. (*Id.*) During the removal, a portion of the

deck collapsed completely. (*Id.*) Subsequent removal of the home's siding

revealed water damage extending in a triangular pattern from the roof to the deck.

(*Id.* at ¶ 3.) The damage at the level of the deck was roughly 15 feet wide, and the

deck had pulled away from the house where the attachment points were rotted out.

(*Id.*)

The Oltzes submitted a claim to Safeco on October 27, 2015. (*Id.* at ¶ 4.)
Rivera spoke with claims adjuster Michael Hoover, who agreed to Rivera's
request to hire a civil engineer to investigate the damage. (Doc. 4 at ¶ 19; Doc. 2
at ¶ 19.) The Oltzes then hired Paul Wells of WMW Engineering, Inc., a
consulting civil and structural engineer, to inspect the damage. (Doc. 24 at ¶ 10.)
Wells is a consulting civil and structural engineer. (*Id.*) He performed an
inspection on October 28, 2015. (Doc. 4 at ¶ 20.) His report, which he provided
to Rivera two days later, concluded that the sheathing and framing of the northeast
wall had suffered "extensive water damage," mostly like due to water being routed
"into the area of the roof/wall connection via a heat cord." (Doc. 24-4 at 1.)
Wells' report stated that an ice dam may have "greatly increased" the amount of
water so routed. (*Id.*)

On October 29, 2015, Safeco sent the Oltzes a Reservation of Rights letter,
informing them that coverage was under investigation.[1] (Doc. 24 at ¶ 5.) Safeco
then hired Wade Sticht of CASE Forensic Engineering, who conducted an
inspection of the Oltzes' home on November 5, 2015. (Doc. 24 at ¶ 6.) Sticht

---

[1] On October 28, 2015, Safeco claims adjuster Michael Hoover wrote "ICE
DAM would be a covered cause of loss, however this needs to be confirmed."
(Doc. 2 at ¶ 30; Doc. 4 at ¶ 32.)

concluded that the deck most likely detached because the wood where it was fastened had "deteriorated," and suspected, though did not observe, that "it had been minimally fastened to the home." (Doc. 17-3 at ¶ 5.) Sticht wrote it was "more probable than not that the primary cause of the deterioration of the exterior wall framing and sheathing was long-term chronic exposure to moisture." (*Id.* at ¶ 6.) Sticht concluded that the "seepage/penetration of water" occurred "as a result of: the as-built roof and wall configuration, inadequate weatherproofing, inadequate flashing at the roof-to-wall interface, and the absence of adequate flashing at the windows." (*Id.* at ¶ 9.)

The Oltzes assert that, following Sticht's inspection, Safeco claims handler Trevor Evans instructed Rivera to submit all bills for payment to him, requested an estimate of the total cost to repair, and instructed Rivera and the Oltzes to continue with demolition and repair. (Doc. 4 at ¶ 24.) Safeco states that Evans specifically reminded Rivera and the Oltzes that coverage had not been determined.[2] (Doc. 2 at ¶ 24.) Stich sent his report to Evans on November 23, 2015. (Doc. 4 at ¶ 25; Doc. 2 at ¶ 25.)

---

[2] In an email exchange with Rivera on November 12 and 13, Evans requested "a copy of the building plans" and stated that "[a]fter [he got] a chance to review [Rivera's] bid for repairs [he] might have some questions on scope or pricing detail." (Doc. 24-12 at 1.)

Safeco sent a second Reservation of Rights letter on November 24, 2015, which included excerpts from the Policy exclusions. (Doc. 24 at ¶ 5.) Tafford Oltz emailed Evans on November 27, 2015, asking for an "immediate commitment that either Safeco is going to cover the repairs or not." (Doc. 4 at ¶ 27; Doc. 2 at ¶ 27.) Evans emailed Rivera on November 29, 2015. (Doc. 4 at ¶ 33; Doc. 2 at ¶ 31). The Oltzes state the email informed Rivera that it would still be several weeks before a coverage decision would be made, (Doc. 4 at ¶ 33), while Safeco states the email informed the Oltzes they could move forward with demolition and related repairs, but that coverage was under investigation and Safeco could not commit to coverage or payments at that time, (Doc. 2 at ¶ 31.) The email does not appear in the record. On January 15, 2016, Safeco sent a third Reservation of Rights letter, which again included excerpts from the Policy exclusions. (Doc. 24 at ¶ 5.)

Safeco denied the Oltzes' claim on January 19, 2016. (*Id.* at ¶ 8.) The letter included exclusion language from the Policy, and the following explanation of denial:

As you can see in the above-referenced policy provisions losses resulting from continuous or repeated seepage or leakage of water, inherent defect, weather, faulty, inadequate or defective design, workmanship and construction, and wet or dry rot, are not covered. The exterior sheathing and windows are non-covered losses due to improper

-5-

flashing and roof construction with non-covered ensuing loss of repeated seepage and leakage of water. The Additional Property Coverage for Collapse excludes coverage for decks unless the loss is a direct result of the collapse of the dwelling or part of the dwelling to which it is attached. Therefore, according to the terms and conditions of your policy, we are unable to provide any coverage for this loss.

(Doc. 1-1 at 72.) Safeco did not initially consider Wells' report, but did so after the Oltzes' counsel provided it in February 2016. (Doc. 24 at ¶ 15; Doc. 17-2 at ¶ 13.) Safeco concluded the report did not affect its coverage decision. (*Id.*) Work on the Oltzes' home was completed in April 2016. (Doc. 24 at ¶ 16.) The Oltzes assert they were unable to completely repair their home in the most appropriate manner because Safeco refused to pay for their losses. (*Id.*)

The Oltzes sued Safeco on August 16, 2016, in the Eleventh Judicial District Court, Flathead County, Montana. (Doc. 1.) The Oltzes request declaratory relief (Count I) and allege breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), common law bad faith (Count IV), and violation of Montana's Unfair Trade Practices Act (Count V). Safeco simultaneously removed the action to this Court and filed its Answer on September 21, 2016. (Doc. 2.) Safeco subsequently moved for summary judgment. (Doc. 15.)

## STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is

no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are drawn in his favor." *Id.* at 255 (citation omitted). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgement—factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## ANALYSIS

## I.     Coverage and Exclusions

Safeco argues that Policy exclusions bar coverage for the Oltzes' losses. (Doc. 16 at 14.) The Oltzes insist both that their losses are not excluded, and that factual questions regarding the cause of their losses preclude summary judgment. (Doc. 25 at 9.)

"[T]he interpretation of an insurance contract is a question of law." *Steadele v. Colony Ins. Co.*, 260 P.3d 145, 149 (Mont. 2011). Insurance policies are "construe[d] . . . strictly against the insurer and in favor of the insured." *Id.* That means that "[w]hen a court reviews an insurance policy, it is bound to

-7-

interpret its terms according to their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products," and that "[e]xclusions from coverage are to be narrowly and strictly construed because they are contrary to the fundamental protective purpose of an insurance policy." *Id.* (citations omitted). The Oltzes bear the initial burden of establishing their claim falls within the Policy's scope of coverage, after which the burden shifts to Safeco to establish the claim is excluded. *Travelers Cas. and Sur. Ins. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 476 (Mont. 2005). If Safeco meets its burden, the Oltzes may still show an exception to the applicable exclusion applies. *Id.*

The Policy provides that "[Safeco] cover[s] accidental direct physical loss to property described in **Building Property We Cover** except as limited or excluded." (Doc. 1-1 at 23.) Covered property in turn includes "the dwelling . . . including structures attached to the dwelling other than fences, driveays, or walkways." (*Id.*) Accordingly, the accidental direct physical loss to the Oltzes' dwelling and attached deck is covered under the Policy unless specifically excluded. Safeco points to several exclusions it asserts preclude coverage, each of which are discussed in turn below.

## A. Moisture

Safeco first argues the Oltzes' losses are not covered because the Policy excludes coverage for losses caused by long term exposure to water and moisture, regardless of the source of that moisture. (Doc. 16 at 14.) Safeco argues three specific exclusions apply: (1) continuous or repeated seepage or leakage of water; (2) weather that contributes to an uncovered cause; and (3) wet or dry rot. (*Id.* at 2.) The Oltzes insist both that an ice dam is the proximate cause of their losses and that questions of material fact preclude summary judgment. Safeco has the better argument.

### 1. Seepage or leakage exclusion

The Property Coverages section of the Policy provides a number of exclusions under the heading "**BUILDING PROPERTY LOSSES WE DO NOT COVER**." (Doc. 1-1 at 23.) The fifth exclusion states that Safeco will not cover losses caused "directly or indirectly by . . . continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years." (*Id.* at 23–24.)

As an initial matter, the experts here agree that moisture caused the damage to the Oltzes' home.[3] Safeco's Engineer, Wade Sticht, concluded in his report that

_____

[3] The Oltzes also offer Rivera's expert testimony as to the cause of the damage. (Doc. 25 at 4.) Safeco has filed a motion in limine seeking to limit Rivera to testifying as a lay witness because he was not disclosed as an expert

the "primary cause" of the "material deterioration of the exterior wall framing and sheathing" was "long-term, chronic exposure to moisture," as "evidenced by the nature and locations of the observed stain patterns and the severity and extent of the deterioration." (Doc. 17-3 at 15; Doc. 24 at ¶ 7.) Sticht also concluded the deck detachment "was most likely caused by the deterioration of the wood into which the deck attachment thru-bolts were fastened." (Doc. 17-3 at 16; Doc. 24 at ¶ 6.) The Oltzes' engineer, Paul Wells, assumed in his report that the damage was "water damage," concluding that "the extensive water damage that has occurred to the sheathing and framing . . . is, most likely, the result of excessive water being routed into the area of the roof/wall connection via a heat cord." (Doc. 24-4 at 1.) And Hafferman Engineering, Inc., a firm the Oltzes' hired to review expert reports, photos, deposition, and video, so it could "render an opinion on the most probable cause of the moisture damage" concluded that "the major damage was caused by melting water from ice melting, either natural warming and cooling patterns, or from the heat from around the heat tape cord." (Doc. 24-5 at 2, 8.)

_____

witness. (Doc. 34 at 2.) The Oltzes agree that he is not an expert an do not intend to offer any expert opinion regarding causation. (Doc. 41.) Accordingly, this memo does not consider Rivera's testimony as to causation, and further restricts consideration of his testimony as appropriate under Federal Rule of Evidence 701. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Hafferman further concluded that, "[a]lthough water may be entering the residence by following the heat tape cord and some minor damage may be occurring from rainfall runoff, the ice damming will have first created a pathway for moisture to enter into the house," and noted particularly that "all parties make continual reference to the ice dam and the moisture from the melting ice that's causing the damage." (*Id.* at 8.)

Next, there is also expert consensus that the damage occurred over an extended period of time, although the exact length of time is unclear. Sticht states in his affidavit that "[i]t is more probable than not that the amount of deterioration [he] witnessed would have taken multiple years to occur." (Doc. 17-3 at 3.) In his deposition, Wells agreed that the plywood sheeting composing the side of the Oltzes' home had wet rot caused by repeated exposure to moisture. (Doc. 17-6 at 6; Doc. 24 at ¶ 11.) Finally, Hafferman Engineering noted in its report that "the ice damming and subsequent moisture damage may have occurred over a long period of time but because it only was occurring and creating damage during short periods of time during any given year, years of damage, once revealed, could appear to have occurred during several months of continuous moisture rather than several years of intermittent moisture." (Doc. 24-5 at 7.)

Thus there is expert consensus that the damages were caused by repeated

exposure to moisture over an extended length of time. In turn, the Policy excludes from coverage "losses resulting from "continuous or repeated seepage or leakage of water . . . which occurs over a period of weeks, months or years." (Doc. 24 at ¶ 5.) As such, Safeco's conclusion that the losses to the Oltzes' home were caused by an excluded peril is correct. Nevertheless, the Oltzes argue that is not the end of the inquiry, because the water would not have infiltrated their home without the presence of an ice dam, which they insist is not an excluded peril under the Policy.

Again, the experts agree that there was an ice dam, and that it was involved in allowing moisture to penetrate the siding. (Doc. 24 at ¶¶ 6, 7.)[4] Wells testified in deposition that water would not have penetrated the siding "to the degree it would take to do that much damage" had an ice dam not been in place. (Doc. 24-3 at 6.) Sticht noted in his report that "[t]he accumulation of snow and ice will allow water to penetrate around the siding and building wrap and wet the sheathing and wood framing." (Doc. 17-3 at 13.) And Hafferman Engineering "concluded that damages suffered by Oltz [sic] were caused by an ice dam and the damages after that were exacerbated by repeated cycles of ice dams, heat tape, ice melting and moisture penetration behind the siding. If the ice dams had not formed, these damages would not have occurred." (Doc. 24-5 at 2.) Ultimately,

_____

[4] Safeco does not contest the presence of an ice dam. (Doc. 27 at 3.)

-12-

viewed in the light most favorable to the Oltzes, the facts show that, without the ice dam, water would not have infiltrated the home.

In light of the ice dam's role, the Oltzes rely on the doctrine of "efficient proximate cause" to argue that, "even if continuous water intrusion contributed to causing [their] losses, such losses would still be covered because an ice dam is an efficient proximate cause." (Doc. 25 at 12.) Safeco disagrees, insisting the ice dam was not the proximate cause of the Oltzes' losses. (Doc. 27 at 3–4.)

In 1927, the Montana Supreme Court articulated the doctrine of efficient proximate cause:

> In determining the cause of a loss for the purpose of fixing the insurance liability when concurring causes of the damage appear, the proximate cause to which the loss is to be attributed is the dominant, the efficient one that sets the other causes in operation; and causes which are incidental are not proximate, though they be nearer in time and place of the loss.

*Park Saddle Horse Co. v. Royal Indemnity Co.*, 261 P. 880, 884 (Mont. 1927).

The Court does not appear to have subsequently applied the doctrine, but *Park Saddle* remains good law. In *Park Saddle*, the insured, Park Saddle, was a tour-guiding company that provided horse excursions in Glacier National Park. *Id.* at 881. Park Saddle had a liability policy with Royal Indemnity, which provided coverage for "liability . . . arising by reason of the maintenance and/or use of

-13-

saddle and pack horses." *Id.* at 883. Park Saddle submitted a claim for coverage after one of its guides "carelessly and negligently lost his way and misguided [a] party into the mountains and forests where there was no trail" and one of the guests was injured while walking her horse across steep terrain. *Id.* at 882. The Court concluded that the accident was "caused efficiently and proximately by the use of horses in the operation of the insured's business," and that coverage therefore applied, the guide's negligence notwithstanding. *Id.* at 884.

The "efficient proximate cause" of *Park Saddle* is reconcilable with the United States Supreme Court's articulation of "proximate cause in the insurance field," which "refers to that cause which is most nearly and essentially connected with the loss as its efficient cause." *Stnd. Oil Co. of N.J. v. United States*, 340 U.S. 54, 58 (1950). That cause is "not necessarily . . . the cause nearest in point of time to the loss." *Id.* Nor does it differ materially from how Montana defines proximate cause in negligence law: "[P]roximate cause is an act or omission which, in a natural and continuous sequence, unbroken by any new, independent cause, produces injury, and without which the injury would not have occurred." *Pappas v. Midwest Motor Exp., Inc.*, 886 P.2d 918, 920 (Mont. 1994).

While not binding here, the State of Washington has more recently articulated the doctrine in the insurance context. In Washington, efficient

-14-

proximate cause mandates

> looking only to the event that results in a loss, which may involve a
> series of intervening, but not superseding, events. The characterization
> of subsequently consequential events within the causal chain is
> irrelevant to the inquiry. If the initial event, the "efficient proximate
> cause," is a covered peril, then there is coverage under the policy
> regardless whether subsequent events within the chain, which may be
> causes-in-fact of the loss, are excluded by the policy.

*Safeco Ins. Co. of America v. Hirschmann*, 773 P.2d 413, 416 (Wash. 1989).

*Park Saddle* is distinct from this case. In *Park Saddle*, the loss was the cost

of an injury to a tourist that, per the policy language at issue, "arose from" the use

of a saddle horse, a risk specifically insured against. Here, the loss was the

damage to the Oltzes' home, and that loss was caused by the repeated intrusion of

water, a specifically excluded peril. If, in contrast, the *Park Saddle* policy had

excluded negligent acts from coverage, the comparison the Oltzes attempt to draw

would be more compelling. But here the dominant cause was leaking water, and

that cause is excluded. Assuming the leakage would not have occurred but for the

ice dam, the leakage was a superseding event in the causal chain. In other words,

the damage only began when water began to leak into the Oltzes' home—the

"initial event." *Hirschmann*, 773 P.2d at 416. Safeco properly relied on the

-15-

seepage or leakage exclusion.[5]

## 2. Weather contributing with non-covered cause or event

The Policy provides that Safeco "do[es] not cover loss caused directly or
indirectly by . . . **Weather** that contributes in any way with a cause or event not
covered in this section to produce a loss. However, any ensuing loss caused by a
covered peril and not otherwise excluded is covered." (Doc. 1-1 at 23, 26.)
"Weather" is not defined by the Policy.

Safeco relies on Wells' identification of naturally occurring weather
conditions as a source of the moisture that damaged the Oltzes' home as evidence
that the weather exclusion was properly applied. (Doc. 16 at 19.) Wells testified
in his deposition that it was his opinion that concurrent causes, including weather,
the ice dam, and the heat cord, allowed infiltration of water to occur. (Doc. 24 at
¶ 14; Doc. 17-6 at 13.) Sticht, meanwhile, identified the source of moisture as,
more probably than not, "precipitation and melt water from normal and expected
weather events." (Doc. 24 at ¶ 7; Doc. 17-3 at 3.) And while the Hafferman
Engineering Report concluded that "normal or expected weather-related

---

[5] A savings clause in "**Building Property Losses We Do Not Cover**"
states Safeco does insure "for any resulting loss" from, *inter alia*, the seepage or
leakage exclusion. (Doc. 1-1 at 24.) However, the savings clause does not apply
if "the resulting loss is itself excluded." (*Id.*) Here, resulting loss would be
damage from rot, which is an excluded peril, as discussed below.

-16-

precipitation would not cause the damage witnessed in the Oltz residence," it also

concluded that "the major damage was caused by melting water from ice melting,

either natural warming and cooling patterns, or from the heat from around the heat

tape cord." (Doc. 24-5 at 7, 8.) Thus there is general consensus among the

experts that weather contributed in some way "with a cause or event not

covered"—namely, "the repeated seepage or leakage of water over a period of

weeks, months, or years"—"to produce a loss." (Doc. 1-1 at 26.) The exact nature

of that contribution is not material to the determination that weather played a role

in allowing water to penetrate the home.

The Oltzes argue that the weather exclusion renders coverage illusory, and

that, "[u]nder Safeco's interpretation of the [P]olicy, it is difficult to imagine a

scenario under which any water damage from any source would ever be covered.

(Doc. 16 at 34.) The Montana Supreme Court has repeatedly emphasized that

illusory coverage violates Montana public policy. *See Hardy v. Progressive

Specialty Ins. Co.*, 67 P.3d 892, 898–99 (Mont. 2003) ("[W]e conclude that an

anti-stacking provision in an insurance policy that permits an insurer to receive

valuable consideration for coverage that is not provided violates Montana public

policy . . . . [and] cannot be enforced."); *State Farm Mut. Auto. Ins. Co. v. Gibson*,

163 P.3d 387, 389 (Mont. 2007) ("[A] provision that defeats coverage for which

valuable consideration has been received violates Montana public policy."). "An insurance policy is illusory if it provides effectively non-existent coverage for the premium paid." *Forsman v. United Financial Cas. Co.*, 966 F. Supp. 2d 1091, 1105 (D. Mont. 2013).

The weather exclusion does not create illusory coverage. As Safeco points out, the exclusion applies to losses resulting from weather "that contributes in any way with a cause or event not covered." The exclusion does not bar coverage caused by weather damage alone, but only bars coverage where an excluded peril caused the loss and weather contributed. Safeco properly relied on the weather exclusion because weather contributed to "a cause or event not covered" to produce the Oltzes' loss.

### 3. Fungi and rot

The fungi and rot exclusion bars coverage for "loss caused directly or indirectly by . . . . *Fungi*, **Wet or Dry Rot, or Bacteria**, meaning the presence, growth, proliferation or spread of *fungi*, wet or dry rot, or bacteria." (Doc. 1-1 at 23, 26.) An exception to the exclusion is provided in the Policy's **Additional Property Coverages** subsection. (*Id.* at 31.) That exception provides Safeco will cover direct physical loss, cost of removal, and cost of replacement and other expenses due to losses caused by fungi and rot, up to $10,000. (*Id.* at 19, 31.)

-18-

However, the exception only applies when such losses "are a result of a loss [Safeco] cover[s]" and are not otherwise excluded. (*Id.*) Finally, "*fungi*" "means any type of form of fungus, including . . . mold or mildew." (Doc. 1-1 at 45.) "Wet rot", "dry rot", and "bacteria" are not defined.

There is no question that the plywood sheathing and portions of the framing of the Oltzes' home were rotting. Rivera testified in his deposition that the rim joist, the attachment between the deck and the house, "was rotted away," and that pieces of it fell away as he removed the house wrap. (Doc. 17-1 at 2, 5.) Wells testified that a photograph of the damage showed "a good example of wood rot." (Doc. 17-6 at 6.) When asked, he agreed that the photograph showed wet rot or rot caused by repeated exposure to moisture. (*Id.*) Finally, Sticht's report states that "[w]hen he inspected the home, [he] witnessed extensive deterioration in the form of rotted wood. It is more probable than not that the amount of deterioration witnessed would have taken multiple years to occur." (Doc. 17-3 at ¶ 6.) This testimony, coupled with the photograph Wells discussed, as well as photographs included in Sticht's report, shows that wood rot damaged the Oltzes' home.

The expert testimony is that the rot was caused by the repeated intrusion of water, and as such the rot was not a direct cause of the loss, meaning that the loss due to wood rot could qualify for the exclusion exception. However, because

-19-

seepage or leakage is itself an excluded peril, and, as discussed above, was the proximate cause of the Oltzes' losses, the exception does not apply. Thus the fungi and rot exclusion also bars coverage.

Viewed in the light most favorable to the Oltzes, the material facts show that their losses were caused by repeated water infiltration over an extended period of time, which resulted from an ice dam on their roof. Because repeated seepage or leakage of water is an excluded peril, and the damages were proximately caused by such leakage, Safeco properly denied coverage. Because weather contributed with an excluded peril, the weather exclusion also bars coverage. And because rot resulted from an excluded peril, the fungi and rot exclusion bars coverage as well.

## B. Defective Design & Maintenance

Safeco next argues the Policy provides no coverage for the Oltzes' losses because they are also the result of defective design and maintenance. (Doc. 16 at 24.) The Oltzes once more insist that an ice dam is the cause of their damages, and resulting losses, and also that disputed facts regarding the allegedly defective roof design, inadequate flashing, and deck collapse preclude summary judgment. (Doc. 25 at 20.) As to disputed facts, the Oltzes have the better argument here.

### 1. Inherent defect and faulty design

The Policy excludes coverage for loss caused directly or indirectly by, *inter*

*alia*, "[w]ear and tear, marring, scratching, deterioration [or] inherent defect, mechanical breakdown" (Exclusion 6). (Doc. 1-1 at 24.) The exclusion states, in pertinent part, that the Policy does not cover loss caused by "faulty, inadequate or defective . . . design, specifications, workmanship, repair, construction . . . materials used in repair, construction, renovation or remodeling . . . or maintenance." (*Id.* at 26.)

Safeco's faulty workmanship argument relies on Sticht's conclusion that the deck detachment may have been exacerbated due to minimal fastening. (Doc. 24 at 38.) Safeco apparently infers from Sticht's conclusion that deck collapse was due to faulty design or workmanship. However, one expert's testimony that minimal fastening may have contributed to the deck collapse is inadequate evidence to support summary judgment. Further, as the Oltzes point out, Rivera stated the deck appeared to be initially properly bolted to the home. (Doc. 25 at 20.)

Safeco also argues that the damage to the Oltzes' home was caused by defective roof design and lack of adequate flashing at the windows, again relying on Sticht's report. (Doc. 16 at 25.) As to the flashing, while Sticht concluded "inadequate flashing at the roof-to-wall interface" allowed water to penetrate the home, (Doc. 17-3 at 4), Hafferman Engineering noted "that the window flashing in

-21-

the Sticht report, whether properly done or not, was not the source of the water damage." (Doc. 24-5 at 5.) And Wells' report noted that "the flashing that was installed along the slope of the roof/wall was properly installed and does not appear to have contributed to the damage." (Doc. 24-4 at 1.)

As to defective design, while Safeco leans heavily on Sticht's conclusion that the "roof configuration" may have contributed to the formation of an ice dam, (Doc. 17-3 at 13), Sticht does not conclude that the design was defective. Finally, Safeco points to the heat tape as evidence of a design defect, effectively arguing that where heat tape exists, so too must a design defect. (Doc. 16 at 25.) But the record does not support the assertion that the mere presence of heat tape proves defective design. Factual issues therefore preclude summary judgment as to the inherent defect and faulty design exclusion.

### 2. Faulty, inadequate, or defective maintenance

The Policy excludes coverage for losses caused by "faulty, inadequate or defective . . . maintenance of property" (Exclusion 18). (Doc. 1-1 at 26.) Safeco relies on Tafford Oltz's statements in his deposition that he had never been on his roof, and did not know whether the heat cord was working before the damage was discovered. (Doc. 16 at 28.) In response, the Oltzes assert they adequately maintain their home, and support their position with Tafford's deposition

testimony that he hired someone to clean the gutters twice a year, and with the affidavit of Brett Miller, who painted the home in July 2015, saw no evidence of rot or water damage, and believed the home was exceptionally well maintained. (Doc. 24 at ¶ 12; Doc. 24-9 at 1–2.) The Oltzes point to a genuine issue of material fact as to defective maintenance, making summary judgment as to inadequate maintenance inappropriate.

## C.    Deck Collapse

Safeco argues the deck collapse is not a covered loss. (Doc. 16 at 30.) The Policy excludes coverage for losses caused by collapse, unless that collapse is covered under the **Additional Property Coverages**. (Doc. 1-1 at 26.) With respect to that exception, "collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (*Id.* at 32.) However, the Policy provides that loss due to collapse of a deck is only covered if the cause of the collapse is a covered peril "unless the loss is a direct result of the collapse of the dwelling or any part of the dwelling to which it is attached." (*Id.*) The Oltzes' home has not collapsed, and summary judgment is appropriate as to the collapse

-23-

exclusion.[6]

## D.    Anti-Concurrent Causes Clause

Safeco also argues that the "anti-concurrent causes clause" (the "Clause")

bars coverage because excluded perils contributed to the Oltzes' losses, asserting

that if any excluded peril contributed to the Oltzes' losses, coverage is barred.

(Docs. 16 at 31, 27 at 12.) The Oltzes insts that, as a matter of first impression, the

Clause should be unenforceable in Montana. (Doc. 25 at 26.) Safeco has the

better argument. Just as the repeated water leakage exclusion bars coverage

because water caused the damage, so too does the Clause.

The Clause provides that Safeco "do[es] not cover loss caused directly or

indirectly by [the excluded perils]," and that "[s]uch loss is excluded regardless of

any other cause or event contributing concurrently or in any sequence to the loss."

(Doc. 1-1 at 23.) Because it is undisputed that at least one excluded peril

(repeated seepage or leakage of water) caused the Oltzes' loss, the Clause

precludes coverage unless it is deemed not to apply. While there is no Montana

law on the subject, the Oltzes argue enforcing the Clause would create illusory

---

[6] The Policy does include an additional property coverage for collapse,
(Doc. 1-1 at 32), but the Oltzes' did not purchase it, (*id.* at 19). In any event,
because the collapse was caused by an excluded peril, the seepage or leakage
exclusion, additional coverage would not apply even if the Oltzes' had purchased
it.

coverage, allowing Safeco to avoid its contractual duties. (Doc. 25 at 28.)

When an issue of state law arises and "the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002) (citation omitted). A federal court must "look to existing state law without predicting potential changes in that law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001). Several fundamental rules of insurance policy interpretation and public policy provide guidance in this regard.

First, as noted above, the Montana Supreme Court has stated that "an insurer may not place in an insurance policy a provision that defeats coverage for which the insurer has received valuable consideration." *Bennett v. State Farm Mut. Auto. Ins. Co.*, 862 P.2d 1146, 1148 (Mont. 1993). Next, "[a] court should interpret terms in an insurance policy according to their usual, common-sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Parker v. Safeco Ins. Co. of Am.*, 376 P.3d 114, 118 (Mont. 2016) (citation omitted). Finally, any ambiguity in the insurance contract "should be construed in favor of the insured." *Id.* "Ambiguity exists when the insuring document, taken as a whole, is reasonably subject to differing interpretations." *Id.*

As to illusory coverage, it is true that the Clause limits the scope of coverage under the Policy. (Doc. 1-1 at 23–26.) However, simply restricting the scope of coverage does not render coverage illusory. Nor, at least in this instance, does it prevent application of the efficient proximate cause doctrine. As discussed above, the Court must still evaluate which cause is dominant. In fact, the language of the Clause reflects the distinction between proximate and remote cause central to the doctrine. Thus, losses *caused* by excluded perils are excluded, even if any other "cause or event" *contributed*. Only if the excluded peril causes the loss is the clause implicated.

Nor does the Clause create ambiguity in the Policy. Instead, the Policy is clear—"accidental direct physical loss" is covered "except as limited or excluded." (Doc. 1-1 at 23.) And that limitation and exclusion hinges on whether a loss is caused, directly or indirectly, by an excluded peril. This interpretation of the Policy gives the terms their common-sense meaning. The Oltzes point to no Montana law barring the application of anti-concurrent causes clauses, and it is reasonable to conclude that the Montana Supreme Court would not bar application of the clause at issue here, where it does not create illusory coverage, would be clear to a consumer of insurance products, and is not ambiguous.

The Oltzes point to cases from Washington and California where courts

refused to enforce anti-concurrent clause provisions. (Doc. 25 at 26.) These cases, which draw from extensive bodies of efficient proximate cause law not present in Montana jurisprudence, do not provide the support the Oltzes seek.

Where wind and rain preceded a landslide which destroyed an insured's home, and "landslide" was an excluded peril, the Washington Supreme Court held that an anti-concurrent causes clause could not be used to circumvent the efficient proximate cause doctrine, and that factual issues existed as to proximate cause. *Hirschmann*, 733 P.2d at 416. But as discussed above, the efficient proximate cause doctrine is consonant with the anti-concurrent cause clause in the Policy—an anti-concurrent cause clause may not exclude the efficient proximate cause of the loss.

In *Julian v. Hartford Underwriters Insurance Co.*, the California Supreme Court applied the efficient proximate cause doctrine and California Insurance Code § 530[7] where "following heavy rains, a slope failed above [the plaintiffs' home] [which] led to a landslide [which] caused a tree to crash into the [plaintiffs] house, and the policy at issue excluded loss "caused directly or indirectly" by

---

[7] "An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause."

-27-

"earth movement", "water damage", and "weather conditions" "if weather conditions contribute[d] in any way with [an excluded peril]." 110 P.3d 903, 905 (Cal. 2005). It held that the "weather conditions" clause did not violate § 530 or the efficient proximate cause doctrine by excluding coverage for damage caused by the rain-induced landslide, noting that "an insurance company can limit the coverage of a policy issued by it as long as such limitation conforms to the law and is not contrary to public policy." *Id.* at 910 (citation omitted). *Julian* thus provides more support for Safeco's position than for the Oltzes'.

Finally, the Oltzes point out that under California law, "'[i]f more than one peril contributes to a loss, the question which is the efficient proximate cause generally is a factual matter for the jury to resolve.'" *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 820 (9th Cir. 2014) (quoting *Julian v. Hartford Underwriters Ins. Co.*, 123 Cal. Rptr. 2d 767, 770 (Cal. Ct. App. 2002) (*review granted and opinion superseded sub nom. Julian v. Hartford Underwriters*, 57 P.3d 362 (Cal. 2002), *and aff'd*, 110 P.3d 903 (2005). However, the facts here, construed in the light most favorable to the Oltzes, show that but for an ice dam water would not have leaked into the Oltzes' home. The question of efficient proximate cause is properly resolvable on summary judgment. *Cf. Sabella v. Wisler*, 377 P.2d 889, 895 (Cal. 1963) ("[W]here the facts on appeal are

-28-

settled or not in dispute, the determination of proximate cause becomes a question of law.").

Montana law does not prohibit anti-concurrent causes clauses, and it is reasonable to conclude the Clause is enforceable here. Repeated leakage or seepage caused the Oltzes' losses, even though the ice dam was a contributing factor. The Clause simply reinforces Safeco's decision to deny coverage.

## II.    Covenant of Good Faith and Fair Dealing

Safeco argues the Oltzes' claims for breach of the covenant of good faith and fair dealing and common law bad faith are barred by Montana's Unfair Trade Practices Act. (Doc. 16 at 34.) The Oltzes concede that summary judgment is appropriate as to common law bad faith, (Doc. 25 at 8), but argue they can maintain a claim for breach of the implied covenant of good faith and fair dealing as a contract action. (*id.* at 29). The Oltzes are correct that Montana law provides for breach of the implied covenant as a contract action, but because Safeco properly concluded their losses were not covered, summary judgment is proper as to this claim as well.

In pertinent part, Montana Code Annotated § 33-18-242(3) provides that

> [a]n insured who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for breach of the insurance contract, for fraud, or pursuant to this section, but not under

-29-

> any other theory or cause of action. An insured may not bring an action
> for bad faith in connection with the handling of an insurance claim.

In turn, "every contract, regardless of type, contains an implied covenant of good

faith and fair dealing. A breach of the covenant is a breach of the contract." *Story*

*v. City of Bozeman*, 791 P.2d 767, 775 (Mont. 1990) *overruled on other grounds*

*by Arrowhead Sch. Dist. No. 75 v. Klyap*, 79 P.3d 250 (Mont. 2003). Accordingly,

the Oltzes may properly bring a contract claim for breach of the implied covenant

of good faith and fair dealing.

However, summary judgment in Safeco's favor is nevertheless appropriate

because the facts show Safeco did not breach the implied covenant. "The implied

covenant of good faith and fair dealing requires honesty in fact and the observance

of reasonable commercial standards of fair dealing in the trade." *Bridger Del Sol,*

*Inc. v. Vincentview, LLC*, 406 P.3d 460, 463 (Mont. 2017) (citing *Story*, 791 P.2d

at 775). Here, Safeco did not deal dishonestly with the Oltzes, but rather kept

them apprised of its investigation and the reasons for its no-coverage

determination. Safeco sent an initial Reservation of Rights letter two days after

receiving the Oltzes' claim, (Doc. 24 at ¶ 5), sent Sticht to investigate the claim a

week later, (*id.* at ¶ 6), and provided two more Reservation letters before declining

coverage, (*id.* at ¶ 5). It was not unreasonable for Safeco to hire its own engineer

to investigate the loss, and while its coverage determination could have been swifter, the record shows Safeco initially informed the Oltzes that coverage was uncertain. Investigating the loss and declining to provide coverage where the insurance contract did not require it is neither dishonest nor outside reasonable commercial standards. Summary judgment is appropriate as to the breach of the implied covenant of good faith and fair dealing claim.

## III.    Unfair Trade Practices Act

Safeco argues it is not liable under Montana's Unfair Trade Practices Act (the "Act") because it promptly and thoroughly investigated the Oltzes' claim and reasonably determined that the Oltzes' loss was excluded from coverage. (Doc. 16 at 35.) The Oltzes insist that Safeco has not shown it had a reasonable basis to deny coverage, and that issues of fact preclude summary judgment. (Doc. 25 at 31.) Safeco's argument prevails.

Montana's Unfair Trade Practices Act provides a number of independent causes of action against an insurer. Mont. Code Ann. § 33-18-242(1). The Oltzes seek relief for violations of § 33-18-242(1), (4-6), (7), and (14). (Doc. 25 at 31; Doc. 4 at ¶ 66.) These claims boil down to the allegation that Safeco engaged in unfair claims settlement practices. (Doc. 4 at ¶ 67.)

However, where an insurer has "a reasonable basis in law or in fact for

contesting a claim or the amount of a claim, whichever is at issue," the insurer is not liable under the Act. § 33-18-242(5). Safeco had a reasonable basis, factually and legally, to contest the Oltzes' claim. The facts show that the damage to the Oltzes' home was caused by long-term leaking water. And, the Policy excludes from coverage damage caused by repeated seepage or leakage of water. *See Parker*, 376 P.3d at 121 ("Because Safeco properly denied Parker's claim based upon an express coverage exclusion in the policy, the District Court properly found that there was no basis for a claim under the [Act]."). Summary judgment is appropriate as to this claim as well.

## IV.   Loss Occurred Before Policy Period

Safeco finally argues the Policy was not effective on the date the damage to the Oltzes home first occurred. (Doc. 13 at 18.) Safeco raises this argument for the first time in its reply brief—and did not raise it in its denial of coverage or reservation of rights letters. The argument will not be considered. *See Thompson v. C.I.R.*, 631 F.2d 642, 649 (9th Cir. 1980). ("The general rule is that appellants cannot raise a new issue for the first time in their reply briefs.")

## CONCLUSION

Viewed in the light most favorable to the Oltzes, the undisputed facts show that the efficient proximate cause of their loss was the repeated seepage or leakage

of water over an extended period of time, an excluded peril. Summary judgment is appropriate as to all of the Oltzes' claims. Accordingly,

IT IS ORDERED that Safeco's motion for summary judgment, (Doc. 15), is GRANTED.

IT IS FURTHER ORDERED that Safeco's motions in limine, (Docs. 31, 33, 35), and the Oltzes' motion to exclude new defenses, (Doc. 38), are DENIED as MOOT.

IT IS FURTHER ORDERED that the clerk of court is directed to enter judgment as reflected above and close the case file.

DATED this _5_ day of February, 2018.

Donald W. Molloy, District Judge
United States District Court